UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DORIE LEWANDOWSKI,

             Plaintiff,

    v.

KILOLO KIJAKAZI, acting
Commissioner of Social Security,

             Defendant.

No. 1:21-cv-00024-GSA

**ORDER DIRECTING ENTRY OF
JUDGMENT IN FAVOR OF PLAINTIFF
AND AGAINST DEFENDANT
COMMISSIONER OF SOCIAL SECURITY**

**(Doc. 21, 26)**

## I.    **Introduction**

Plaintiff Dorie Lewandowski ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is before the Court on the parties' briefs which were submitted without oral argument to the United States Magistrate Judge.[1]  Docs. 21, 26, 27.  After reviewing the record the Court finds that substantial evidence and applicable law do not support the ALJ's decision.  Plaintiff's appeal is therefore granted.

## II.    **Factual and Procedural Background[2]**

On July 6, 2018 Plaintiff applied for supplemental security income.  AR 41.  The Commissioner denied the application initially on November 5, 2018, and on reconsideration on March 5, 2019.  AR 293, 298.  Plaintiff requested a hearing which was held before an Administrative Law Judge (the "ALJ") on June 16, 2020.  AR 71–108.  On July 21, 2020 the ALJ issued a decision denying Plaintiff's application.  AR 41–57.  The Appeals Council denied review

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge.  *See* Docs. 7 and 10.

[2] The Court has reviewed the relevant portions of the administrative record including the medical, opinion and testimonial evidence about which the parties are well informed, which will not be exhaustively summarized.  Relevant portions will be referenced in the course of the analysis below when relevant to the parties' arguments.

on November 25, 2020.  AR 1–7.  On January 7, 2021, Plaintiff filed a complaint in this Court.

### III.   The Disability Standard

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted).  If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-

(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff  bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

### IV.   The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date of July 6, 2018.  AR 44.  At step two the ALJ found that Plaintiff had the following severe impairments: history of traumatic brain injury in 1993, lupus, fibromyalgia, undifferentiated connective tissue disease (UCTD), Hashimoto's thyroid, bilateral carpal tunnel syndrome status post release surgery on the right, history of obesity with bariatric bypass surgery, depression, anxiety, somatoform disorder, and neurocognitive disorder.  AR 44.  The ALJ also found at step two that Plaintiff had the following non-severe impairments: pre-diabetes, irritable bowel syndrome, reactive lymphoid hyperplasia, and endometriosis.  AR 44.  At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 44.

Prior to step four, the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 416.967(b) with postural restrictions, frequent balancing, frequent bilateral handling and fingering, no exposure to vibrations or hazards, and only simple/routine tasks at the unskilled level with a DOT GED

reasoning level of 2 or less.  AR 46–55.

At step four the ALJ concluded that Plaintiff could not perform her past relevant work as a data entry clerk, medical assistant, or phlebotomist.  AR 55–56.  At step five, in reliance on the VE's testimony, the ALJ concluded that Plaintiff could perform other jobs existing in significant numbers in the national economy, namely: garment sorter, routing clerk, and laundry folder III.  AR 56–57.  Accordingly, the ALJ concluded that Plaintiff was not disabled at any time since her application date of July 6, 2018.  AR 57.

**V.      Issues Presented**

Plaintiff asserts two claims of error: 1) that the ALJ erred in rejecting the opinions of Drs. Dryland, Narus, and Malleis without proper evaluation; and 2) that the ALJ failed to include work-related limitations in the RFC consistent with the nature and severity of Plaintiff's limitations, and failed to offer clear and convincing reasons for rejecting Plaintiff's subjective complaints.

**A.      The Opinions**

**1.      Applicable Law**

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity.  *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC).  "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."  *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so, the ALJ must

4

determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). The RFC need not mirror a particular opinion; it is an assessment formulated by the ALJ based on all relevant evidence. *See* 20 C.F.R. §§ 404.1545(a)(3).

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, when evaluating any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors and the agency will articulate how the factors of supportability and consistency are considered. *Id.*

On April 22, 2022, the Ninth Circuit addressed whether the specific and legitimate reasoning standard is consistent with the revised regulations, stating as follows:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. See 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ..., including those from your medical sources."). Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a

5

treating or examining doctor's opinion, which stems from the special weight given to such opinions, see Murray, 722 F.2d at 501–02, is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022)

## 2.   **Analysis**

Plaintiff's substantive argument begins at page 11 of the 15 page brief.  Plaintiff takes issue with the ALJ's rejection of Dr. Malleis' opinion, her internal medicine physician, who opined that Plaintiff has a less-than-sedentary exertional capacity, requires rest breaks throughout the day, and that she cannot perform any lifting or carrying or gross/fine manipulation in a competitive work situation.  AR 2078–80.

Initially, Plaintiff disputes the ALJ's speculation that "with such extreme limitations, one would expect that claimant would require 24/7 care to feed, bathe, and dress her."  AR 54.  Plaintiff contends that the ALJ's statement ignored the context of the opinion, which considered not the Plaintiff's ability to periodically lift or manipulate objects in pursuit of basic self-care, but her ability to do so on a sustained basis in a competitive work situation.  Doc. 11 (citing AR 2076, 2079).  Indeed, this statement did not add to the persuasiveness of the ALJ's decision.  Having a less than sedentary exertional capacity does not necessarily equate to requiring 24/7 care, and conversely, maintaining basic self-care does not necessarily  establish that one has at least a sedentary exertional capacity.

Secondly, Plaintiff disputes that the ALJ found Dr. Malleis' opinion inconsistent with Dr. Dryland's examination findings from five days earlier which the ALJ characterized as "largely normal."  Plaintiff contends this is a misstatement of fact as Dr. Dryland noted 18/18 1-2+ Fibromyalgia tender points and generalized hypermobility.  Br. at 11 (citing AR 54, 2070).  However, this argument is not well taken.  The ALJ explicitly acknowledged the 18/18 tender point

findings and the generalized hypermobility.  AR 45-46 (citing Ex. C41F/4-5).  The fact that Plaintiff exhibited the requisite number of tender points to support a diagnosis of fibromyalgia does not necessarily support an inference that her fibromyalgia limits her to a less than sedentary exertional capacity, noes does the finding of generalized hypermobility.

Moreover, the ALJ characterized the exam as "largely normal," not entirely normal, which was accurate.  The tender points and generalized hypermobility were the noted exceptions to Dr. Dryland's otherwise normal musculoskeletal exam:  "Gait is normal.  Nails without pitting or vasculitic lesions. All joints were examined and reveal good stability, ROM, strength, without effusions, warmth or tenderness with the exception of: generalized hypermobility, no synovitis, 18/18 1-2+ fibro tender points."  AR 2070.

Plaintiff reiterates the same discussion in reply, arguing that the 18 tender points support the all-encompassing work-preclusive limitations identified by Dr. Malleis.  Plaintiff suggests the ALJ ignored the same and selectively picked only the normal findings.  Again, the argument is belied by the fact that the ALJ characterized the exam findings as "fairly benign" and "largely normal," (not entirely normal or entirely benign).  The ALJ underscored the normal findings while also acknowledging that Plaintiff exhibited 18/18 tender points at all relevant examinations.  *See* AR 45 ("At her most recent rheumatological examination on June 23, 2020, she was found to have 18/18 positive 'fibro tender points.'"); AR 48 ("In June 2018, the claimant established care with rheumatologist David Dryland, MD. . . . Upon examination . . . She exhibited 18/18 fibromyalgia tender points."); AR 48 ("Follow-up notes from Dr. Dryland dated in September 2018 state the claimant again exhibited 18/18 fibromyalgia tender points."); AR 48 ("Upon reexamination by Dr. Dryland in March 2019, the claimant again had 18/18 positive fibromyalgia tender points."); AR 49 (same).

Plaintiff contends the ALJ offered no other reason for discounting Dr. Malleis' opinion.  To

the contrary, in the sentence immediately following the two that Plaintiff disputes the ALJ stated, "Also, one must wonder how the claimant packed and suitcase and flew across the country to North Carolina and then back again in connection with her online dating. Dr. Malleis' opinions are not persuasive." AR 54. Plaintiff offers no attempt in her opening brief or reply at explaining how this trip is consistent with Dr. Maelleis' identified limitations. For present purposes suffice to say that while her flights from Oregon to North Carolina and back do not necessarily refute each purported limitation in Dr. Malleis' opinion, they do generally cast significant doubt on the opinion including her purported need for periodic leg elevation throughout the workday, inability to lift or carry any amount of weight, and inability to sit longer than 30 consecutive minutes. The manipulative limitations identified therein is an exception, which is discussed in more detail below.

Finally, Plaintiff contends the ALJ did not discuss the supportability of the opinion as required by 20 C.F.R. § 404.1520c(c). The ALJ recited the content of the opinion then stated that with such extreme limitations one "would not expect" a normal physical exam five days earlier. The ALJ concluded the paragraph by stating Dr. Malleis' opinions "are not persuasive." The clear implication is that the ALJ found the opinion unsupported by the most recent physical examination predating the opinion.

Granted, the revised regulations do appear to contemplate explicit use of the term supportability. *See* 20 C.F.R. § 404.1520c(b)(2) ("The factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. *Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions* . . .) (emphasis added).

Nevertheless, Plaintiff identifies no caselaw reversing and remanding solely for an ALJ's failure to use that term explicitly, nor is the Court aware of any such case law. Moreover, explicitly

using the word "supportability" would not cure an otherwise inadequate explanation.  Similarly, omitting the word does not render an adequate explanation inadequate.

Plaintiff also disputes the ALJ's rejection of the opinions of Dr. Dryland, Plaintiff's treating rheumatologist, who also opined (like Dr. Malleis) that Plaintiff had a less than sedentary exertional capacity, would need frequent position changes and rest breaks, and would be significantly off task and absent from work. 1164–68, 1893–96.  Plaintiff again disputes the ALJ's reliance on purportedly benign findings during Dr. Dryland's physical examination (as summarized above) and the ALJ's statement that the examination notes "do not objectively describe deficits of strength, sensation, reflexes, or mobility that would preclude fulltime work activity."  AR 49.

Plaintiff contends the ALJ's reasoning minimizes the importance of the 18/18 fibro trigger points, and the ALJ's insistence on objective functional deficits is improper as a matter of law because, as some courts have recognized, those objective deficits do not necessarily manifest with fibromyalgia.  Br. at 12 (citing *Contreras v. Berryhill*, 2:17-CV-01371, 2018 WL 2473677, at *4 (W.D. Wash. May 9, 2018) ("those suffering from fibromyalgia may show normal muscle strength and neurological reactions, full range of motion, and no synovitis, and the absence of objective findings suggesting a specific physiological cause for a patient's pain is one of the diagnostic criteria for fibromyalgia.").

Plaintiff's reliance on *Contreras* is misplaced.  At issue was the ALJ's finding that the plaintiff did not meet the diagnostic criteria for fibromyalgia under Social Security Ruling 12-2p due to lack of sufficient tender points and because, "there were no objective findings to support a diagnosis of fibromyalgia."  *Id.*  The court found the ALJ's reasoning faulty, recognizing that S.S.R. 12-2p sets forth two alternative sets of criteria to establish the diagnosis, only one of which requires tender points, and neither of which require objective findings.  *Id.*

Here, by contrast, all agree that Plaintiff met the diagnostic criteria for fibromyalgia.

Having established the diagnostic criteria are met, there is no authority suggesting musculoskeletal examination findings such as strength and joint range of motion are impermissible considerations when evaluating the impact of the disease on a claimant's functionality.  To the extent Dr. Dryland's opinion suggests that pain intolerance and associated off task behavior are the functional impediments (and not strength or range deficits), the examination still does not necessarily demonstrate a debilitating level of pain.  Rather, Dr. Dryland variously graded the 18/18 tender points between 1 and 2+, ostensibly on the fibromyalgia symptom severity scale ranging from zero to 3.  AR 1232 –33, 1542, 1880–81, 2069–70.

Plaintiff also disputes the ALJ's rejection of Dr. Narus' opinion, Plaintiff's neurologist, who similarly opined that Plaintiff had a less than sedentary exertional capacity due to prior traumatic brain injury to the left frontal and temporal lobes.  AR 1318–22.  Plaintiff takes issue with the ALJ's statement that the opinion was "out of proportion to his one-time encounter and with the overall evidence of record, including treatment notes from multiple providers and Dr. Col's report."  AR 55.  Plaintiff contends the reference to the overall evidence of record is insufficiently specific to satisfy the specific and legitimate reasoning standard.  That standard is no longer applicable as the Ninth Circuit recently made clear.  *See Woods,* 32 F.4th at 792.

In any event, the ALJ set forth an adequate explanation supported by substantial evidence and grounded in the regulatory factors of supportability and consistency.  Of importance here is the immediately preceding paragraph in which the ALJ noted that, during Dr. Narus' one time encounter, "claimant was alert and oriented, with cooperative behavior, intact higher cerebral, normal gait and station, 'subtle' collapsing give way weakness in all four extremities with pain behavior, intact sensation, and symmetric reflexes. Based on the examination Dr. Narus referred the claimant for an EEG and an MRI study of her brain, with the results of both studies being unremarkable."  AR 55.  Notwithstanding the subtle extremity weakness, the otherwise benign

findings by Dr. Narus on examination as well as the unremarkable EEG and brain MRI undermine the opinion that she had work preclusive limitations in essentially every respect attributable to her history of traumatic brain injury.

Moreover, in finding Dr. Narus' opinion unsupported the ALJ referenced Dr. Col's report summarizing his neuropsychological examination from which the ALJ specifically underscored the following statement: "Because [the claimant] has had extensive physical evaluations, neural imaging studies, and neuropsychological evaluations over the past five years—with none of those evaluations producing any convincing evidence for a physical source to her reported symptoms— it might be useful for [her] to explore possible psychological sources to her symptoms."  AR 51. This statement by Dr. Col further supports the ALJ's rejection of Dr. Narus' opinion that Plaintiff had work preclusive physical limitations attributable to the identified diagnosis of traumatic brain injury.

Although Plaintiff has a different view on the permissible inferences to be drawn from Dr. Col's report:

> Dr. Col concluded that Plaintiff exhibited signs of somatization, and that the source of symptoms that have no physical source may in fact be the conversion of psychological distress. Ar. 1312. Thus, Dr. Col's report actually supports the conclusion that Plaintiff is suffering severe physical limitations despite a lack of objective findings.

Br. at 13,  Dr. Narus did not opine on limitations attributable to psychological distress; he opined on limitations attributable to traumatic brain injury.  Thus, the possibility that Plaintiff's physical symptoms are a manifestation of psychological distress is not a defense of Dr. Narus' opinion.   It seems that Plaintiff's contention is that additional limitations were warranted in light of physical manifestations of psychological distress, and as such opted to couch her first claim of error in terms of the ALJ's purported inadequate treatment of her three physicians' opinions generally, none of which opined on physical manifestations of psychological distress.

As to Plaintiff's psychological impairments and associated limitations, the ALJ provided extensive discussion of the same including the medical and opinion evidence, a discussion which Plaintiff does not dispute. *See* AR 45–46, 50–54 (discussing the examinations, notes and opinions of the psychiatric professionals including LPC Verducci, Dr. Col, LCSW Higby, QMHP Allred, QMHP Barlow, and the DDS reviewers Drs. Freidburg and Gonzalez).

Plaintiff identifies no error in the ALJ's analysis of the opinions of Drs. Malleis, Dryland, or Narus, other than to the extent Plaintiff makes a brief reference to the manipulative limitations identified by Dr. Malleis which are discussed in more detail below.

## B.    Plaintiff's Testimony

### 1.    Applicable Law

The ALJ is responsible for determining credibility,[3] resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p.

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the

---

[3] Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016.  Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities."  S.S.R. 16-3p at 1-2.

symptoms limit an individual's ability to perform work-related activities."  S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons.  *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p at *10.  Subjective pain testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining the severity of claimant's pain and its disabling effects."  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

The ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record.  S.S.R. 16-3p at 5.

## 2.   <u>Analysis</u>

The substantive portion of Plaintiff's 2 page argument consists of the following:

> The ALJ conceded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Ar. 47. However, the ALJ failed to set forth any clear and convincing reason for discounting *Plaintiff's symptoms*, or identify evidence that was inconsistent with *her complaints*.

> In assessing Plaintiff's symptoms, the ALJ vaguely concluded that Plaintiff's statements and alleged limitations are inconsistent with the medical and other evidence of record "for the reasons explained in this decision." Ar. 47. However, the ALJ's overall summary of evidence fails to state a basis for discounting *Plaintiff's alleged pain and symptoms*

> . . .

> While the ALJ summarized Plaintiff's treatment history and objective findings, he failed to explain why any of these facts contradict *Plaintiff's alleged symptoms and limitations*. Ar. 47-55. The ALJ's decision includes a summary of Plaintiff's testimony and a summary of her treatment history, but the ALJ offered absolutely no explanation as to how one is inconsistent with the other. While the ALJ did assert that the objective findings contradict the medical opinions, the ALJ heavily relied upon normal physical presentations despite the fact that Plaintiff was routinely observed to have 18/18 fibromyalgia tender points consistent with her widespread pain, and EMG nerve testing revealed significant carpal tunnel syndrome. *Plaintiff's*

*subjective complaints* are consistent with and supported by the opinions and examination findings of her treating providers, and the ALJ's failure to identify any basis for discounting *her subjective complaints* requires remand.

Br. at 14–15 (emphasis added).

Plaintiff's critique of the boilerplate language included in every ALJ decision is not compelling.  Plaintiff's brief is also susceptible to a criticism similar to the one she directs at the ALJ.  Plaintiff offered only a summary of facts and medical evidence and an assertion that the two are consistent.  Her subsequent analysis made only non-specific references to the earlier summary, as italicized above.

To the extent Plaintiff believes her testimony and/or summary thereof speaks for itself, that's largely not the case:

> At the hearing, Plaintiff testified to the following: Her symptoms include burning pain and numbness in the arms, tingling in the hands, and difficulty with gripping and grasping. Ar. 77-78. She has trouble typing and her condition causes widespread inflammation and pain. Ar. 78. She also suffers significant fatigue. Ar. 78. She spends most of her day lying down in bed or a recliner. Ar. 81. She may watch television or play a game on her phone, but she can only play for about 10 minutes at a time. Ar. 96-97.
> She struggles to get out of bed and she has had to ask for help stirring macaroni because she has no strength in her hands. Ar. 83. She attempts to cook but in the end her daughter finishes cooking, and her daughter also takes care of laundry. Ar. 92-93. If her daughter is not home to cook, she just does not eat. Ar. 94. She underwent carpal tunnel release surgery on the right, but her symptoms worsened so she cancelled her left hand surgery. Ar. 85. She can perform self-care but she avoids bathing unless someone else is home because she may fall or get sick. Ar. 93. She underwent optional gastric bypass surgery because she believed it would help her pain and fatigue, but her fatigue only worsened due to difficulty getting the right nutrition and vitamins. Ar. 91-92.
> She confirmed that she moved to North Carolina briefly in pursuit of an online relationship, but the move did not entail much because she does not have her own residence. Ar. 79-80. Since she lives with her daughters, she simply packed one suitcase and flew there. Ar. 80. When the relationship did not work, she flew back to live with her daughters. Ar. 80. She has since given up on the idea of a relationship because of her health conditions and limitations. Ar. 81-82.

The highlighted testimony reflects various adjectives used to describe the nature of the pain, and reflects that certain activities are fatiguing, pain inducing, and difficult.  AR 77–78.  The

highlighted testimony also reflects that she does in fact choose to spend most of the day in a recliner with no specific context as to why she does so or whether there is any alternative.  AR 81.  These statements do not speak to the existence of limitations greater than the ALJ included in the RFC.  The RFC is not the most one can do while remaining symptom free; it is the most one can do despite one's limitations.  *See* 20 C.F.R. § 416.945 ("Your residual functional capacity is the most you can still do despite your limitations.").

The highlighted testimony arguably speaks to one limitation more restrictive than reflected in the RFC, namely that she lacks the focus to play scrabble on her phone for more than 10 minutes.  This would certainly preclude her from meeting the mental demands of any job regardless of task complexity or reasoning level.  The ALJ did not reject the existence of all concentration limitations, finding moderate limitations in that area at step three and including restrictions in the RFC related to task complexity and reasoning level.  In so concluding, the ALJ noted that "the claimant has consistently maintained focus and concentration during treatment and consultative appointments."  *Id.*  The ALJ's subsequent discussion reveals at least two instances in which Plaintiff displayed normal concentration as alluded to, namely at the one-month post bariatric surgery follow-up (AR 48, citing Ex. C8F/44-47), and upon examination by QMHP Allred (AR 52, citing Ex. C25F/1-7).

The reasoning requires no inferential leaps and is sufficient to refute Plaintiff's testimony that her concentration problems preclude her from playing more than 5-10 minutes of scrabble on her phone.  No controlling legal authority requires the ALJ to overtly connect that medical evidence to the testimony regarding scrabble being played on a phone where the ALJ has already identified the medical evidence as a basis for finding only moderate concentration limitations.

Plaintiff also offered various testimony regarding her hand limitations:

Q All right, so Ms. Lewandowski, first question, can you explain to us this new, newer disorder , this autoimmune disorder , undifferentiated connective tissue disease and how it limits you and your ability to function?

15

. . .

A   Well no , I was just gonna say every, every one or two months he does major blood work and then you know alters my medication to try to fix things. What it mainly means, is my like my skins on fire. It feels like there's a sunburn. My arms burn they go numb even if I elevate 'em. Tingling in my hands , trying to grip things, trying to open doors. You know, open a can of, of you know a jar peanut butter. Typing, writing is even harder, so typing is a little easier , but it's still cramps , and then I have to pop my fingers and I, yeah. It just it ' s inflammation all over the entire body, down my legs , they burn at night when I 'm sleeping, I gotta get up, yeah.

. . .

Sorry, I 'm trying not to cry, I 'm really tired . And for somebody who used to be able to lift 150 pound machines and load trucks with the big boys , and now I can barely get out of bed and I have to ask my daughters to stir the macaroni    and cheese because I have no strength in my hands. It's a lot to change.

. . .

Q   You mentioned , you , you mentioned that you have to have your daughters help you with stirring mac and cheese , and you ' re talking about your hand , so is that also related to the autoimmune disease or what, where does the issues with the hands come in?

A   Well, it's gonna be the arthritis. It's gonna be the carpal tunnel in both wrists, and then from what I know it's gonna be 'cause they remove the lymph nodes from those underarms, which causes fluid back up and, yeah. I mean that's what they said is it causes fluid back up. It ' s like your lymph, lymph -- they told me your lymph node system is like a drainage system and I've got a clog in both sides. So . . .

AR 77–78, 83–84.

The testimony regarding macaroni stirring appears to be a statement made in passing in order to explain why she was emotional during the hearing, and in order to juxtapose her substantial functional capacity from years earlier (when she could lift 150 lbs), to her current state. To the extent she maintains that she lacks sufficient hand strength to stir macaroni, the testimony is belied by other evidence including her ability to pack a suitcase and travel to and from North Carolina.

The remaining testimony states  she has trouble gripping things, opening doors, opening jars of peanut butter, that writing is difficult, that typing is also difficult but easier than writing, and

16

that she has to pop her fingers due to cramps when typing.  AR 77.  In short, Plaintiff did not testify in so many words that her carpal tunnel syndrome, UCTD, fibromyalgia or other disorders deprive her of any meaningful use of her hands.  Her testimony established little more than basic activities were difficult and symptom inducing.  Counsel did not pose clarifying questions to establish with any degree of certainty the extent to which she can perform the aforementioned activities with or without assistance, with what frequency, or for what duration.  Again, her statements do not speak to the existence of limitations greater than the ALJ included in the RFC.

This illustrates the inherent difficulty in constructing concrete work related restrictions from seemingly generalized conversational testimony.  Even where the ALJ's articulated reasoning is unpersuasive or unclear, when the testimony itself is equally unpersuasive and unclear it's not apparent that remand is required to reconsider the testimony, or what remand instructions would be appropriate.  Plaintiff proposes the Court remand the matter "for further administrative proceedings and proper evaluation of the evidence, in order to determine the impact of Plaintiff's severe impairments on her functional capacity."  Br. at 15.

If Plaintiff believes that the ALJ gave her testimony less than full consideration, more must be done that simply arguing the existence of error based mostly on the ALJ's "rejection" of testimony. [4]  It would be much more effective to have identified the insufficient or missing limitations at issue (such as manipulative activities, sitting, standing, lifting, etc), and identifying

---

[4]  This common briefing strategy has developed in response to Ninth Circuit caselaw requiring a more robust explanation for discrediting such evidence than might otherwise apply.  The "clear and convincing" standard has been described as "the most demanding standard required in Social Security cases."  *Moore v. Commissioner of SSA*, 278 F.3d 920, 924 (9th Cir. 2002).  But neither *Moore* nor any other controlling caselaw creates a freestanding basis for remand based solely on "improper testimony rejection."  ALJs perpetuate this fiction through their uniform use of boilerplate language finding "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record *for the reasons explained in this decision*."  Those reasons scarcely appear, inviting claims of error similar to the one presented here.  Yet those reasons need not appear where, as here, the testimony amounts to an informal conversation with little to no direct bearing on any dispositive issue.

the evidence in support including testimony, medical evidence, and opinion evidence.[5]

Notwithstanding, the Court does find the existence of error with respect to the ALJ's restriction to frequent manipulative activities.  Plaintiff's discussion in her brief of this issue is arguably sufficient so that it is not waived, and thus may be considered by the Court.  *See* Br. at 11 (referencing Dr. Malleis' identified manipulative limitations, among others, and asserting the ALJ erred in rejecting the same); Br. at 15 (asserting that her testimony generally was consistent with the medical evidence of record, including EMG testing revealing severe carpal tunnel).  Even if not, the Court exercises its discretion to address it.  *See generally Rayborn v. Colvin*, No. 3:15-CV-01478-HZ, 2016 WL 5799348, at *5 (D. Or. Sept. 30, 2016) (in which the court exercised its discretion to address an argument the claimant arguably waived by omission).

In short, there is no medical evidence, opinion evidence, or other evidencing substantially supporting the notion that Plaintiff can frequently perform manipulative activities.  And this observation does not bear upon the clear and convincing reasoning standard, nor the ALJ's reasoning for rejecting Plaintiff's testimony.

As to the medical evidence, an April 2019 nerve conduction study showed severe bilateral carpal tunnel syndrome.  AR 50 (citing Ex. C19F/16).  Dr. Osullivan's February 20, 2020 visit notes identified reduced ROM, positive Tinel's sign, positive Phalen's test,  numbness and tingling in the distribution of the median nerve. AR 1843.  Plaintiff underwent right sided release surgery.

As to the opinion evidence, Dr. Malleis' opinion identified the April 2018 EMG establishing moderate to severe bilateral carpal tunnel syndrome as one of the objective signs upon which his opinion was based, and he opined that Plaintiff could perform handling and fingering for zero

---

[5] In which case the failure of Plaintiff's testimony to support the alleged limitation would not be prejudicial to the claim of error, because the testimony would be but another piece of evidence supporting the claim of error, rather than central to the claim of error itself.  There is no reason why the more rigorous "clear and convincing reasoning" standard could not still apply to the testimony as one category of evidence identified in support of a claim of error (namely the omission of required limitations).

percent of an eight hour day.  AR 2076–77, 2079.  Although that opinion is not entirely supportable in finding *zero* manipulative capacity,[6] it is another piece of evidence undermining the ALJ's finding as to frequent manipulative capacity.

To summarize, the evidence establishes the following: Plaintiff presented with wrist symptoms consistent with bilateral carpal tunnel; examination revealed objective signs consistent with bilateral carpal tunnel (reduced ROM, positive Phalen's, positive Tinel's); nerve conduction testing established severe bilateral carpal tunnel; Plaintiff underwent release surgery for right sided carpal tunnel; she found the surgery ineffective and opted out of surgery for left sided carpal tunnel; Dr. Malleis' opined she could perform zero handling and fingering due to severe carpal tunnel; the ALJ assessed Plaintiff with severe impairment of bilateral carpal tunnel; the ALJ found Plaintiff could finger and handle frequently (2/3 of an eight hour day) "[i]n consideration of the claimant's bilateral carpal tunnel syndrome."

The ALJ's discussion of the surgery and its aftermath contains the ALJ's most pertinent (but still insufficient) reasoning on the subject:

> In February 2020 she underwent right carpal tunnel release surgery. (Exhibit C24F/47-48). According to treatment notes from Dr. Cavazos dated in June 2020, the claimant subjectively reported that her symptoms of carpal tunnel syndrome were worse following the surgery. (Exhibit C38F/1). However, as the encounter occurred over video due to the COVID-19 Pandemic, Dr. Cavazos did not perform a physical examination of the claimant. In consideration of the claimant's bilateral carpal tunnel syndrome, the residual functional capacity limits her to the light exertion range, with no more than frequent bilateral handling and fingering. It also contains limitations regarding actions that would place stresses on one's wrists, including crawling and climbing ladders, ropes, and scaffolds.

AR 50.

The record does not contain substantial evidence to support the ALJ's finding that, in consideration of severe carpal tunnel, Plaintiff's handling and fingering capacity should be reduced

---

[6] The above-quoted testimony reflects some capacity to perform activities including opening jars, writing, and typing, albeit with difficulty.  AR 77-78.

from unlimited to 2/3 of an 8-hour day, which is not a particularly meaningful reduction.   The ALJ's reasoning suggests she doubted Plaintiff's subjective statement that her right sided release surgery was not only ineffective but made her symptoms worse, and that due to the telehealth nature of the follow-up appointment, her physician could not perform a corroborative physical exam. However, there is no evidence that the surgery was helpful either.  And, whether it was helpful or not, the fact remains that Plaintiff did not have left sided surgery.  Thus, she still had severe left sided carpal tunnel at a minimum.  Faulting the Plaintiff for not pursuing the remaining treatment options (left sided release surgery) would still require some evidence that the right sided surgery was beneficial and  helpful.

This leaves the suitcase packing and cross country flights to and from North Carolina as the only related facts identified in the ALJ's opinion which arguably undermines the handing and fingering limitations (facts which the ALJ identified to support her rejection of Dr. Malleis' opinion, and which Plaintiff did not address in her brief or reply).  Additionally, the fact that Plaintiff packed a suitcase and flew to and from North Carolina generally argues against  the notion that she has a less than sedentary exertional capacity (or lacks sufficient hand strength to stir macaroni), as noted above.

However, neither packing a suitcase nor travelling with it to North Carolina support the inference that she can perform handling and fingering for 2/3 of an 8-hour day.  Packing a suitcase of unknown size and weight, and flying across the country speaks to perhaps reasonably adequate upper extremity strength.  It perhaps also serves as an isolated instance reflective of grip strength and the related work function of handling, but it does not necessarily suggest that she can perform handling 2/3 of an eight hour day, or that she has sufficient dexterity to perform the manipulative activity of fingering on a consistent basis. *See* SSR 85-15 (noting that handling refers to "seizing, holding, grasping, turning," and fingering refers to "picking, pinching, or otherwise working

primarily with the fingers.").  The error here is harmful given the VE's testimony that a reduction frequent to occasional would eliminate the 3 jobs identified (a reduction which may or may not be warranted pending additional proceedings, and which may or may not eliminate *all* available jobs, a matter the VE did not address).  AR 106.

At the same time, the record does not suggest she can perform no handling and fingering as opined by Dr. Malleis.  *See* AR 77-78 (suggesting she has at least some capacity to grasp, open jars, write, and type, albeit with difficulty).  The Court takes no position as to where on the spectrum between zero manipulation and frequent manipulation Plaintiff's capacity falls.

### VI.   Conclusion and Remand for Further Proceedings

Remand is appropriate for the ALJ to conduct additional proceedings including but not limited to ordering a consultative physical examination, and/or taking additional testimony in order to identify the parameters of Plaintiff's handling and fingering capacities with more particularity and proceed through the sequential process as necessary.  *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

### VII.   Order

For the reasons stated above, the Court finds that substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled.  Accordingly, Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is granted.  The Clerk of Court is directed to enter judgment in favor Plaintiff Dorie Lewandowski, and against Defendant Kilolo Kijakazi, acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **July 20, 2022**                                /s/ **Gary S. Austin**
                                                UNITED STATES MAGISTRATE JUDGE